J. Ryan Mitchell (9362)
Wesley D. Felix (6539)
**MITCHELL BARLOW & MANSFIELD, P.C.**
Nine Exchange Place, Suite 600
Salt Lake City, Utah 84111
Telephone:  (801) 998-8888
Facsimile:   (801) 998-8077
Email: rmitchell@mbmlawyers.com
            wfelix@mbmlawyers.com

Michael A. Carvin (*pro hac admission pending*)
Ryan J. Watson  (*pro hac admission pending*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
E-Mail:  macarvin@jonesday.com
            rwatson@jonesday.com

*Attorneys for Plaintiffs*

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| DIGITAL RECOGNITION NETWORK, INC.; VIGILANT SOLUTIONS, INC., | PLAINTIFFS' COMPLAINT |
| Plaintiffs, | Civil No. _____ |
| v. | |
| GARY HERBERT, *in his official capacity as Governor of the State of Utah*; SEAN D. REYES, *in his official capacity as Attorney General of the State of Utah*, | |
| Defendants. | |

### COMPLAINT

Plaintiffs Digital Recognition Network, Inc. ("DRN") and Vigilant Solutions, Inc.

1

("Vigilant"), through their undersigned attorneys, bring this civil action against Defendant Gary Herbert, in his official capacity as Governor of the State of Utah, and Defendant Sean D. Reyes, in his official capacity as Attorney General of the State of Utah, and allege as follows:

## Summary of the Action

1. DRN uses photographs and image-content analysis techniques to serve the financial services, insurance, and vehicle repossession industries. Because DRN and others use such techniques in an effort to locate specific content within a photograph—namely, the alphanumeric content printed on a license plate—the application of this technology that is at issue here has sometimes been referred to as "automatic license plate reader" ("ALPR") technology.

2. DRN's ALPR systems, which are typically mounted on tow trucks, take photographs that include nearby vehicles' license plates. DRN then disseminates the resulting license-plate data to its clients and partners, which use the data for purposes such as identifying cars that should be repossessed and locating cars that have been stolen or fraudulently reported as stolen.

3. DRN also provides captured license-plate data to Vigilant, which then shares the data with law enforcement agencies for purposes that range from utilizing near real-time alerts for locating missing persons and stolen vehicles to the use of historical license-plate data to solve crimes.

4. DRN and Vigilant bring this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202, to have the Court declare that the Utah Automatic License Plate Reader

System Act ("the Act"),[1] which prohibits Plaintiffs' use of ALPR systems, violates Plaintiffs' freedom of speech under the First and Fourteenth Amendments of the Constitution of the United States.

5. DRN and Vigilant further seek a preliminary injunction against the application or enforcement of the Act so that they can resume their constitutionally protected speech—namely, the dissemination and collection of license-plate data using ALPR systems—in Utah.

6. DRN and Vigilant further seek a permanent injunction against the application or enforcement of the Act.

7. The Act prohibits Plaintiffs from using ALPR systems to photograph a license plate and from disseminating that license-plate data to their clients and partners, thus impermissibly restricting Plaintiffs' constitutionally protected speech.

**The Parties**

8. Plaintiff DRN, which commenced business in 2007, is a Delaware corporation. DRN's principal office is located at 4150 International Plaza, Suite 800, Fort Worth, TX 76109.

9. Plaintiff Vigilant, which was founded in 2005, is a Delaware corporation. Vigilant's headquarters is located in Livermore, California.

10. Defendant Gary Herbert is Governor of the State of Utah. As the chief executive of the State of Utah, the Governor is responsible for the execution and enforcement of the State's laws. *See* Utah Const. Art. VII, § 5. The Governor acts under color of law and is sued in his official capacity.

---

[1] 2013 Utah Laws 447 (codified at Utah Code § 41-6a-2001 to § 41-6a-2006, and § 63G-2-305).

11. Defendant Sean D. Reyes is Attorney General of the State of Utah. It is the Attorney General's mission to "enforce the law, . . . to work with law enforcement and protect the interests of Utah, its people, environment and resources." *Office of the Attorney General: My Mission*, at http://attorneygeneral.utah.gov/my-mission/ (last visited Feb. 11, 2014); *see* Utah Const. Art. VII, §§ 1, 16. The Attorney General acts under color of law and is sued in his official capacity.

## Jurisdiction and Venue

12. This action arises under 42 U.S.C. § 1983 and the First Amendment to the Constitution of the United States, as made applicable to the states by the Fourteenth Amendment.

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

14. Plaintiffs also seek declaratory and injunctive relief under 28 U.S.C. §§ 2201-02, Federal Rule of Civil Procedure 57, and Federal Rule of Civil Procedure 65.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred or will occur in this District and, upon information and belief, the Defendants reside within the State of Utah and within this District, *see* Utah Const. Art. VII, § 1.

## Additional Allegations

**I.   DRN And Vigilant Wish To Resume Their Use Of ALPR Systems To Disseminate And Collect License-Plate Data Within Utah.**

16. Vigilant develops technology that analyzes photographs and looks for specific content that might be contained within the photograph. At the most basic level, image-content analysis is the extraction of meaningful information from a photograph, and it can be achieved

4

by either a human or by a machine such as a digital camera, mobile phone, computer, processor, or electrical circuit.  Vigilant executives have developed image-content analysis techniques for various markets, including techniques for optical character recognition, pattern recognition, and motion detection.

17.     The technique developed by Vigilant involving the use of Optical Character Recognition ("OCR") is the subject of this suit.  In one of its applications of image-content analysis, Vigilant utilizes a Digital Signal Processor ("DSP") to convert analog camera output (a photograph) into a digital photograph that can then be analyzed by DSP algorithms to determine if the image contains a pattern that could be representative of a rectangle containing alphanumeric characters (*i.e.,* a possible license plate).  Upon location of a possible license plate within an image, the DSP disregards all other aspects of the photograph and performs additional de-skewing, normalization, and character segmentation processes in an effort to improve the chances of successful interpretation or recognition of the printed alphanumeric text contained within the depicted rectangle.  The DSP then utilizes OCR algorithms to convert images of text (*i.e.,* alphanumeric characters) printed on the license plate from being only human readable depictions of text to being both human-readable and computer-readable text.  As noted above, these types of applications have sometimes been labeled within the industry as "automatic license plate reader" or "ALPR" systems.[2]

---

[2] They are also known within the industry as follows:  Automatic Number Plate Recognition (ANPR), Automatic Vehicle Identification (AVI), Car Plate Recognition (CPR), License Plate Recognition (LPR), and Mobile License Plate Recognition (MLPR).  From a purely technical standpoint, ALPR technology is not really a technology, but rather is an application within the field of image-content analysis that utilizes a technique or technology known as OCR.

18. DRN uses image-content analysis technology developed by Vigilant to serve the automobile finance, automobile insurance, and vehicle repossession industries. DRN cameras, which are typically mounted on tow trucks or vehicles owned by repossession companies, automatically photograph everything the camera-equipped vehicle passes during its daily routine of driving on the public streets of its respective city or town looking for vehicles to repossess (for automobile lenders), while simultaneously looking for vehicles that have been reported stolen (for insurance carriers).[3]

19. Once an ALPR system converts the license-plate image into computer-readable text, software simultaneously cross-checks the alphanumeric characters from the license plate against a database of license plates registered to vehicles that are sought for repossession by lending institutions that DRN serves. DRN then disseminates the matching license-plate data to its clients, which include automobile lenders and insurance companies. DRN earns substantial revenue by selling this license-plate data to its clients.

20. When there is a match between the captured license-plate data and the database, software alerts the driver that the vehicle is subject to repossession and prompts the driver to call a dispatch number to verify that the vehicle is still subject to repossession. If the vehicle is verified as still being subject to repossession, then the DRN camera affiliate is authorized to repossess the vehicle.

21. The ALPR cameras date and time-stamp each digital photograph, as well as recording the GPS coordinates that indicate where the photograph was taken. When this information is captured by a computer in the vehicle, it is uploaded in real time to DRN's data

---

[3] The companies that mount DRN's ALPR systems on their vehicles are referred to as DRN's "camera affiliates."

center, where it is stored and processed for use by DRN to aid in recovering vehicles for lending institutions and insurance carriers.

22. The data that DRN's ALPR systems collect—a photograph of the license plate, as well as the date, time, and location—do not contain any personally identifiable information such as the name, address, or phone number of the registered owner. License-plate data thus cannot be linked to a specifically identifiable person unless it is combined with other data, such as records maintained by a state's department of motor vehicles. Access to such motor-vehicle records is, however, strictly regulated by the federal Drivers Privacy Protection Act ("DPPA") and various state laws. For example, the DPPA "establishes a regulatory scheme that restricts the States' ability to disclose a driver's personal information without the driver's consent." *Maracich v. Spears*, 133 S. Ct. 2191, 2198 (2013) (internal quotation marks omitted) (citing 18 U.S.C. §§ 2721(a)(1), (a)(2)). In addition, Utah law restricts access to drivers' motor-vehicle records. *See* Utah Code §§ 41-1a-116(1)(a), (3); § 63G-2-202.

23. Many law enforcement agencies utilize ALPR systems to assist in locating stolen vehicles, missing persons, and terror suspects, as well as to assist in drug and human trafficking cases.

24. Plaintiffs' clients and partners use license-plate data captured by ALPR systems for purposes such as identifying cars that should be repossessed, locating cars that have been stolen or fraudulently reported as stolen, and assisting law enforcement in finding kidnapped children and stolen vehicles.

25. DRN has a partnership with Vigilant's National Vehicle Location Service, through which DRN's ALPR data is made available to law enforcement agencies—usually at no

cost to the agencies.  DRN's data thus assists law enforcement in locating missing persons and finding stolen vehicles.

26. Prior to passage of the Act, DRN sold a total of ten ALPR camera kits to five companies operating in Utah.  Specifically, American Automotive Recovery purchased two kits from DRN at a total cost of $24,575; Network Recovery Systems/Inner Global Recovery Systems purchased three kits at a total cost of $35,275; Repros Recovery purchased three kits at a total cost of $34,313; Recovery First purchased one kit for $8,750; and Swift Towing purchased one kit for $17,000.

27. In Utah, American Automotive Recovery began operating DRN's ALPR camera kits in May 2010; Network Recovery Systems/Inner Global Recovery Systems began operating its kits in March 2010; Repros Recovery began operating its kits in January 2011; Recovery First began operating its kit in April 2010; and Swift Towing began operating its kit in February 2012.

28. Prior to the enactment of the Act in 2013, DRN was collecting ALPR data in Utah and disseminating the data to its clients and partners—including Vigilant, which was then sharing the data with law enforcement agencies.

29. Prior to the Act, DRN sold license-plate data collected by ALPR systems in Utah to clients such as automobile lenders and insurance companies, thus generating revenue for DRN.

30. In addition, prior to the Act, Vigilant served thirty-three law enforcement agencies in Utah.  These law enforcement agencies accessed Vigilant's ALPR data network for the purposes of locating vehicles of interest to law enforcement investigations.

8

31. Prior to the Act, when law enforcement agencies in Utah made queries against Vigilant's data, the data resulted in investigative leads 39% of the time. Vigilant's data thus assisted law enforcement in efforts such as locating fugitives, locating abducted children, and investigating and solving a variety of major crimes. In many (if not all) cases, Vigilant provided this data free of charge.

32. As a result of the Act, DRN's Utah camera affiliates have stopped using their ALPR systems, which are the source of DRN's license-plate data. Moreover, because of the Act, DRN can no longer disseminate or sell license-plate data collected by ALPR systems in Utah. Additionally, the Act precludes DRN from selling additional camera kits in Utah to camera affiliates such as repossession companies. The Act also prohibits Vigilant from receiving DRN's Utah-based license-plate data and from disseminating this data to law enforcement agencies. In short, Plaintiffs' operations in Utah have ceased.

33. But for the Act, Plaintiffs and their affiliates would resume their collection and dissemination of captured license-plate data using ALPR systems within Utah. But for the Act, DRN and its camera affiliates would collect license-plate data using ALPR systems in Utah, and DRN would then generate revenue by selling this data to clients such as automobile lenders and insurance companies. In addition, were it not for the Act, DRN would seek to sell additional camera kits in Utah, thus generating further revenue. Finally, but for the Act, Vigilant would receive Utah-based ALPR data from DRN and would disseminate it to law enforcement agencies.

**II.     The Act Injures Plaintiffs By Preventing Them From Using ALPR Systems To Disseminate Or Collect License-Plate Data.**

34.     The Act provides that, "[e]xcept as provided in Subsection (2), a person or governmental entity may not use an automatic license plate reader system." Utah Code § 41-6a-2003(1). Subsection (2), which contains the list of enumerated exceptions, states that "[a]n automatic license plate reader system may be used: (a) by a law enforcement agency for the purpose of protecting public safety, conducting criminal investigations, or ensuring compliance with local, state, and federal laws; (b) by a governmental parking enforcement entity for the purpose of enforcing state and local parking laws; (c) by a parking enforcement entity for regulating the use of a parking facility; (d) for the purpose of controlling access to a secured area; (e) for the purpose of collecting an electronic toll; or (f) for the purpose of enforcing motor carrier laws." § 41-6a-2003(2).

35.     The Act defines an "[a]utomatic license plate reader system" as "a system of one or more mobile or fixed automated high-speed cameras used in combination with computer algorithms to convert an image of a license plate into computer-readable data." § 41-6a-2002(1).

36.     Section 41-6a-2003(1)'s prohibition on the "use" of an ALPR system precludes Plaintiffs from disseminating or disclosing license-plate data that is captured by an ALPR system. *See* § 41-6a-2003(1).

37.     Section 41-6a-2003(1)'s ban on the "use" of ALPR systems also prevents Plaintiffs from using ALPR systems to collect license-plate data. *See* § 41-6a-2003(1). In other words, Plaintiffs would violate this provision if they were to use "a system of one or more mobile or fixed automated high-speed cameras" to photograph a license plate and then were to

10

utilize "computer algorithms to convert an image of a license plate into computer-readable data." *Id.*

38. Section 41-61-2004(1) contains restrictions on the disclosure, use, sharing, and retention of "[c]aptured plate data" that was obtained pursuant to one of the Act's enumerated exceptions. *Id.* (imposing restrictions on "[c]aptured plate data obtained for the purposes described in Section 41-6a-2003"); *see also* § 41-6a-2002(2) (defining "[c]aptured plate data" as "the global positioning system coordinates, date and time, photograph, license plate number, and any other data captured by or derived from an automatic license plate reader system"). For example, "[c]aptured plate data obtained for the purposes described in Section 41-6a-2003" "may not be used or shared for any purposes other than the purposes described in Section 41-6a-2003" and "may only be disclosed . . . in accordance with the disclosure requirements for a protected record under Section 63G-2-202," pursuant to "a disclosure order under Subsection 41-61-2005(2)," or pursuant to a federal or state warrant. § 41-61-2004(1). Additionally, § 41-6a-2004(2) sets forth additional restrictions on the sharing or sale of "captured plate data" by "[a] person or governmental entity that is *authorized* to use an automatic license plate reader system under this part." *Id.* (emphasis added); *see also* § 41-6a-2003(2) (authorizing ALPR use for purposes that fall within one of the statute's enumerated exceptions).

39. Section 41-6a-2006 provides that "[a] person who violates a provision under this part is guilty of a class B misdemeanor." Accordingly, Plaintiffs would be subject to criminal penalties if they were to use an ALPR system in Utah.

11

### III. The Act's Ban On Plaintiffs' Dissemination And Collection Of License-Plate Data Captured By An ALPR System Violates The First Amendment.

40. Plaintiffs' dissemination of license-plate information collected by ALPR systems is speech protected by the First Amendment. Similarly, the use of ALPR systems to collect and create information by taking a photograph amounts to constitutionally protected speech.

41. The Act is a content-based speech restriction. The illegality of speech under the statute turns on the *content* of what is being photographed and transmitted through ALPR systems—license-plate information is covered, but other content is not. The Legislature has singled out the collection and dissemination of an "image of a license plate" and the resulting "computer-readable data." Utah Code § 41-6a-2002(1), 41-6a-2003(1); *see also* § 41-6a-2002(2). Moreover, the Act's extensive exceptions further demonstrate that it discriminates based on the content of the speech and the identity of the speaker.

42. Because the Act's speech restrictions are content-based and speaker-based, they are subject to heightened scrutiny, which they cannot survive. In any event, the Act violates the protections afforded commercial speech against neutral regulation because the Act (1) does not further a substantial governmental interest, (2) does not directly and materially advance a governmental interest, and (3) restricts more speech than is necessary to further the governmental interest at issue. Moreover, even if a blanket ban on ALPR use would directly and materially advance a substantial interest, the Act's numerous gaps and exceptions fatally undermine the State's purported privacy interest and demonstrate that the Act cannot directly and materially advance that interest.

43. The State does not have a substantial interest in preventing persons from viewing or photographing license plates—or from disseminating the information collected when doing

so—because license plates contain no private information whatsoever. Moreover, the photographic recording of government-mandated public license plates does not infringe any "privacy" interest that concededly is not infringed when the photographer views the plate. Thus, the State cannot carry its heavy burden to demonstrate that it has a substantial interest that is served by the Act.

44. The State cannot demonstrate that the Act directly and materially advances any privacy interest. If the State is seeking to prevent the dissemination of license-plate data in circumstances where that data might be combined with personal information derived from another source and then misused in some way, the Act's restriction on the use of ALPR systems is inherently an indirect means of furthering this purported privacy interest. Specifically, the Act's suppression of speech relating to publicly-displayed license plates in an effort to prevent misuse of private data that might theoretically be combined with license-plate information is too attenuated to survive scrutiny under *Central Hudson*. Moreover, the Act does not materially advance the State's purported privacy interest.

45. In addition, the speech restrictions in the Act are not adequately tailored because they are more extensive than necessary to serve any purported privacy interest that might be at stake here. For example, the Act bans Plaintiffs' use of an ALPR system merely to *collect* license-plate data, even if that data is never disseminated to another person.

46. When a statute imposes a selective ban on speech, the government must justify the distinctions and exceptions found in the statute based on its asserted rationale for regulating the speech. The Act is riddled with gaps and exceptions that arbitrarily permit a wide array of speech that has precisely the same "privacy" implications as speech the statute prohibits. These

exceptions dramatically undermine any claim that ALPR usage by entities such as Plaintiffs infringes privacy interests and any effort to show that the Act directly and materially advances any "privacy" interest.

## FIRST CLAIM FOR RELIEF

### Declaration That The Utah Automatic License Plate Reader System Act Violates the Free Speech Clause of the First Amendment to the United States Constitution

47. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 46 as though fully set forth herein.

48. The Act violates the First and Fourteenth Amendments of the United States Constitution because it does not satisfy the heightened scrutiny given to content- and speaker-based speech restrictions and also because it does not further a substantial governmental interest, does not directly and materially advance any such interest, and is not narrowly tailored to further a substantial governmental interest.

49. The Act injures Plaintiffs by preventing them from exercising their First Amendment freedoms to disseminate and collect license-plate data captured by an ALPR system.

50. Declaring the Act invalid would remedy Plaintiffs' injury by freeing them to engage in constitutionally protected speech—namely, the collection and dissemination of license-plate data captured by an ALPR system.

## SECOND CLAIM FOR RELIEF

### Injunctive Relief Against Defendants

51. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 50 as though fully set forth herein.

52. Under 42 U.S.C. § 1983, persons such as Defendants "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

53. As alleged in paragraphs 10-11, Defendants act under the color of state law as the Governor and Attorney General of the State of Utah in enforcing the Act in their official capacities.

54. But for the Act's unconstitutional restriction on speech, Plaintiffs and their camera affiliates would collect and disseminate captured license-plate data using ALPR systems.

55. The Act injures Plaintiffs by depriving them of their opportunity to engage in valuable speech by disseminating and collecting license-plate data using an ALPR system.

56. Enjoining the Act would remedy Plaintiffs' injury by freeing them to engage in constitutionally protected speech—namely, the dissemination and collection of license-plate data captured by an ALPR system.

57. Plaintiffs have no adequate remedy at law.

**Prayer for Relief**

**WHEREFORE**, Plaintiffs DRN and Vigilant respectfully request that this Court grant the following relief:

A. A declaration that the Act's provisions, as well as any applicable rules and regulations regarding those provisions, violate the Free Speech Clause of the First Amendment;

B. Preliminary and permanent injunctions enjoining Defendants from applying or enforcing

    the Act's provisions, as well as any applicable rules and regulations regarding those provisions;

C. Costs and attorneys' fees pursuant to 42 U.S.C. § 1988 or any applicable statute or authority; and

D. Such other or further relief the Court deems to be just and appropriate.

Dated: February 13, 2014                    Respectfully submitted,

                                          /s/ J. Ryan Mitchell
                                    J. Ryan Mitchell
                                    Wesley D. Felix
                                    Mitchell Barlow & Mansfield, P.C.
                                    Nine Exchange Place, Suite 600
                                    Salt Lake City, Utah 84111
                                    Telephone:  (801) 998-8888
                                    Facsimile:   (801) 998-8077
                                    Email:  rmitchell@mbmlawyers.com

                                    Michael A. Carvin*
                                    Ryan J. Watson*
                                    JONES DAY
                                    51 Louisiana Avenue, N.W.
                                    Washington, D.C.  20001
                                    Telephone: (202) 879-3939
                                    Facsimile: (202) 626-1700
                                    macarvin@jonesday.com
                                    *Attorneys for Plaintiffs*
                                    *\*Applications for admission pro hac vice pending*